**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**NICHOLAS ZIMMERMAN,**

                                                              **Plaintiff,**

                    **vs.**                                                    **9:03-CV-1389 (TJM)**

**GEORGE SEYFERT, et al.,**

                                                              **Defendants.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**MEMORANDUM-DECISION**
**and ORDER**

       In this amended civil rights complaint,[1] Plaintiff alleges a variety of Due Process; First

Amendment; and Eighth Amendment claims allegedly committed by the Defendants, and resulting

from an incident in which Plaintiff was being investigated for an escape attempt at Sing Sing

Correctional Facility (Sing Sing). (Dkt. No. 36).  Presently before the Court is Plaintiff's motion for

partial summary judgment and Defendants' cross motion for summary judgment pursuant to FED. R.

CIV. P. 56. (Dkt. Nos. 105, 121).  Plaintiff has responded in opposition to Defendants' cross-motion.

(Dkt. No. 128).

_____

       [1] This is Plaintiff's third amended complaint.  The original complaint was filed on
November 17, 2003. (Dkt. No. 1).  The Court ordered Plaintiff to file an amended complaint
because the original did not comply with FED. R. CIV. P. 8 & 10. (Dkt. No. 9).  Plaintiff's first
amended complaint also did not comply with the Federal Rules, so the Court ordered the first
amended complaint stricken and ordered Plaintiff to file another amendment. (Dkt. Nos. 8, 9).
Plaintiff filed a second amended complaint that was accepted by the Court.  However, Plaintiff was
later granted a motion to amend, and filed his third amended complaint which is now under
consideration. (Dkt. Nos. 26, 35, 36).

                                                    1

**DISCUSSION**

**1.    Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990)(citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving  party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)(citations omitted).  However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987)(citation omitted).

**2.    Facts**

**A.  Due Process**

Although Plaintiff begins his complaint with a discussion of his May 15, 2003 transfer from Sing Sing to Shawangunk Correctional Facility (Shawangunk) and his subsequent placement in Administrative Segregation (Ad Seg) at Shawangunk, there is additional background necessary for an understanding of the facts surrounding Plaintiff's claims.  A great deal of material has been submitted by both Plaintiff and Defendants in support of their motions, and the court will attempt to

2

summarize these submissions.  Plaintiff's deposition was taken on April 8, 2006,[2] and many of the Defendants have submitted affidavits.  Plaintiff has filed transcripts of portions of the criminal trial at which he as convicted of attempted escape based upon many of the facts that underlie the claims in this case. (Dkt. No. 128, Plaintiff's Exhibits, Pt.1).

On May 7, 2003, a corrections officer at Sing Sing advised Defendant Darren Daughtry, an Investigator with the New York State Police, that an unknown individual had entered Sing Sing, dressed in a correction uniform and had presented false identification, indicating that he was Corrections Officer Anthony White. Daughtry Aff. ¶ 2.  Defendant Daughtry traveled to Sing Sing to obtain more information about the incident. *Id.*

Defendant Daughtry learned that the officers had questioned the man's credentials and had escorted him to the executive offices for further investigation. *Id.*  The man was carrying a bag containing additional corrections uniforms. *Id.*  After being escorted to the executive offices, the man asked to use the bathroom and managed to leave the prison without being detected. *Id.*  As a result of this incident, the New York State Police, with the assistance of other agencies, began a search for this individual. *Id.*

Defendant Daughtry states that the next day, he learned that the Ossining Police Department had interviewed people who were in the area of the prison following the incident. *Id.* ¶ 3.  Defendant Daughtry reviewed the names and descriptions of those interviewed, and one person, Tony Dubose, matched the description of the individual who had entered the facility with false credentials. *Id.*  The New York State Police located Mr. Dubose, arrested him on May 12, 2003, and questioned him about the incident.

---

[2] Dvorin Declaration, Exs. A(1) & A(2).

Mr. Dubose told Defendant Daughtry that a woman named Jatanya offered to pay Dubose $15,000.00 to help a man, known as "Puzz," escape from Sing Sing. *Id.*   ¶ 4.  The plan was that Mr. Dubose would dress as a corrections officer, enter the prison with the false credentials, and arrange for the escape. *Id.*  Mr. Dubose stated that he attempted to carry out the plan, but failed and left the prison after he asked to use the bathroom. *Id.*  Mr. Dubose told Defendant Daughtry that Jatanya and another woman, named Tamara, were waiting for him in a rental car. *Id.*

Defendant Daughtry states that he contacted an officer at Sing Sing who informed him that Plaintiff's nickname was "Puzz" and regularly received visits from Jatanya Belnavis and Tamara Johnson. *Id.* ¶ 5.  The New York State Police located the two women. *Id.*  When questioned, Jatanya Belnavis identified Corrections Officer Quangtrice Wilson as having been involved in the plan. *Id.* ¶ 6.  Officer Wilson was also interviewed and admitted that she agreed to provide Plaintiff with information about the daily operation and lay-out of the facility and allowed a digital picture to be taken of her shield and identification card. *Id.*  Defendant Daughtry believed that Plaintiff's friend, Latrina Boyd, also assisted in obtaining the false credentials. *Id.*  ¶ 7.

During his investigation, Defendant Daughtry communicated with Department of Correctional Services (DOCS) Deputy Inspector General (IG), Defendant George Seyfert. *Id.* ¶ 8. Defendant Daughtry states that his investigation of this incident began on May 7, 2003 and "in view of the number of people involved in the conspiracy," the investigation remained open until the end of January 2004, when the matter was submitted to a Grand Jury. *Id.* ¶ 9.  Plaintiff was indicted, and on April 8, 2005, a jury found him guilty of various offenses connected with the escape attempt.[3] *Id.*

---

[3] Defendant Daughtry states that Plaintiff was convicted of bribery, promoting prison contraband, attempted escape, and conspiracy. Daughtry Aff. ¶ 10.

at ¶ 10.  Plaintiff was sentenced on June 7, 2005. *Id.*  Plaintiff, however, claims that Defendant Daughtry supplied false information to the officials at Shawangunk regarding the incident and then, on February 10, 2004, violated Plaintiff's due process rights by arresting him without probable cause to believe that Plaintiff had attempted to escape. AC ¶¶ 46-47.

Defendants have also submitted the affidavit of Deputy IG Seyfert. Seyfert Aff.  The affidavit includes a description of the Office of the IG and its functions. Seyfert Aff. ¶¶ 1-4. Defendant Seyfert states that among other functions, the IG is responsible for investigating allegations of violations of DOCS rules and regulations, and the New York State Penal Law by both staff and inmates. *Id.* at ¶ 3.  The IG is also responsible for assisting other law enforcement agencies outside of DOCS and making sure that substantiated incidents are referred to the appropriate agency for review, possible disciplinary action, and/or criminal prosecution. *Id.* ¶¶ 3-4.

In his affidavit, Defendant Seyfert states that his office was notified a short time after the May 7, 2003 incident. *Id.* ¶ 7.  The case was referred to Defendant Seyfert in his capacity as a Deputy IG for one of the Internal Affairs Units of the office. *Id.*  Defendant Seyfert assigned two senior investigators to the case and immediately sent them to Sing Sing. *Id.*  The New York State Police and the local police were notified. *Id.*  Defendant Seyfert states that on May 14, 2003, he and one of his senior investigators met with investigators of the New York State Police, and during that meeting, Plaintiff was identified by the New York State Police as a suspect in the May 7, 2003 escape attempt. *Id.* ¶ 9.

On May 15, 2003, Plaintiff was transferred to Shawangunk.  In an affidavit, Defendant Joseph Smith, Superintendent of Shawangunk, states that prior to Plaintiff's arrival at Shawangunk, Smith spoke with Defendant Seyfert. Smith Aff. ¶ 5.  During that conversation, he and Defendant

Seyfert discussed various issues regarding Plaintiff, including the potential security risk that he posed in light of the attempted escape from Sing Sing. *Id.*  Defendant Smith states that, during that conversation, he learned the information surrounding the escape attempt and Plaintiff's potential involvement. *Id.*  ¶ 6.

It was based on the information provided by Defendant Seyfert that Defendant Smith decided that Plaintiff should be placed in administrative segregation upon his arrival at Shawangunk, and to then be given a hearing regarding the administrative segregation placement. *Id.* Defendant Smith states that he based his decision on the information that the escape attempt involved "accomplices outside the facility, who breached Sing Sing's security by concealing their identities using fake DOCS officials uniforms and credentials." *Id.*  Defendant Smith also stated that he took into account the information that Plaintiff had developed a personal relationship with a corrections officer who provided Plaintiff with information regarding the daily operation and lay-out of the facility. *Id.*

Defendant Smith states that it was because of this "sophisticated scenario" that he believed Plaintiff posed a threat to the safety and security of the facility, warranting administrative segregation. *Id.* ¶ 7.  Administrative segregation involves restricted privileges[4] and close monitoring of inmates. *Id.*  Defendant Smith states that if Plaintiff had been given all of the privileges in general population, he could have potentially abused those privileges by smuggling contraband or by contacting potential witnesses and interfering with the criminal investigation. *Id.* ¶ 8.  Defendant Smith states that he was also concerned that Plaintiff could attempt to plan another escape, and the

---

[4] These restrictions include restricted movement around the facility, access to telephones, visitation, and packages. Smith Aff. ¶ 7.

additional restrictions were necessary to prevent Plaintiff from contacting any potential accomplices. *Id.*

Defendant Smith states that based on all the above information, he ordered Plaintiff's placement in administrative segregation, pending a hearing. *Id.* ¶ 9.  Defendant Smith specifically states that Defendant Seyfert did not order Defendant Smith to place Plaintiff in Ad Seg. *Id.* Defendant Sergeant Lutz prepared Plaintiff's Ad Seg report based on Defendant Smith's order, and Defendant Deputy Superintendent for Security (DSS) Maly authorized the Ad Seg report. Smith Aff. ¶ 9 & Ex. A.  However, it was ultimately Defendant Smith's decision to place Plaintiff in segregation. *Id.*  Plaintiff received the Ad Seg report on May 17, 2003. *Id.*

The Amended Complaint alleges that Defendant Seyfert "directed" Defendant Smith to place Plaintiff in administrative segregation without due process. AC ¶ 30.  Plaintiff further alleges that Defendant Lutz prepared an insufficient Ad Seg report, which failed to inform Plaintiff of the date, time, and place of the "incident." AC ¶ 31.  Plaintiff states that Defendant Maly authorized the report and "failed to cure" the violations.

On May 22, 2003, Plaintiff was afforded his first hearing on the administrative segregation recommendation.  The documents associated with this hearing have been submitted as Dvorin Declaration, Ex. B.  The hearing ended on May 25, 2003.  The hearing officer was Defendant Squillace, and Plaintiff's chosen employee assistant was Defendant Wilkins. *Id.* Ex. B at 9, 11. Plaintiff has included as an exhibit the list of documents and witnesses that he requested from Defendant Wilkins, together with Defendant Wilkins's responses to those requests. Plaintiff's Ex. B (Attached to Dkt. No. 105).  Plaintiff alleges that Defendant Wilkins violated Plaintiff's due process rights by failing to obtain the documents and witnesses requested by Plaintiff.

7

Plaintiff also alleges that Defendant Squillace violated Plaintiff's due process rights at the May 22-25, 2003 Ad Seg hearing by failing to call requested witnesses, failing to order the production of documents, and making a decision that was not supported by sufficient evidence. AC ¶¶ 34-36.  A transcript of the hearing has been included as Dvorin Declaration, Ex. E.  Defendant Maly was the only witness at the hearing. (5/25/03 Hearing Transcript at 10-14).

Defendant Squillace upheld Plaintiff's placement in Ad Seg, and Plaintiff appealed the decision.  On August 25, 2003, Defendant Selsky reversed the administrative determination based on insufficiency of evidence and sent the matter back to the facility for a new hearing.  Plaintiff argues that Defendant Selsky violated Plaintiff's due process rights by allowing a second hearing rather than simply reversing the determination and expunging the records. AC ¶ 38.

After Selsky's administrative reversal for insufficient evidence, another hearing was scheduled, and Defendant Chapperino was assigned as Plaintiff's employee assistant. Dvorin Declaration Ex. C at 16.  Once again, Plaintiff requested a series of documents and witnesses, some of which were refused due to the "ongoing investigation." *Id.* at 19-22.  Plaintiff's second hearing began on August 29, 2003 and ended on September 4, 2003. *Id.* at 7.  Defendant Pico was the hearing officer, and a transcript of the hearing has been filed as Dvorin Declaration Ex. F.

At the second hearing, Plaintiff maintained that he did not attempt to escape on May 7, 2003 because he was in the visiting room with 17 corrections officers and 65 visitors when the "code blue" was announced in the jail. (8/29/03 Hearing Transcript at 13).  Plaintiff told the hearing officer that although he did not receive the requested documents from his assistant, he had already seen the documents because his attorney and his private investigator had obtained these documents, so Plaintiff already knew what the facts of the alleged escape were. *Id*. at 12-13, 19.  Plaintiff's

focus was to convince Defendant Pico that Plaintiff did not "go to the door . . . intend to open the door [or] . . . try to run out the door." *Id.* at 20.

Defendant Lutz testified at Plaintiff's second hearing. *Id.* at 23-26.  Defendant Lutz testified that he wrote the administrative segregation recommendation because he was told to do so by Defendant Maly, and that Defendant Lutz had not personally reviewed any of the paperwork in the case. *Id.* at 23, 25.  Defendant Chiapperino also testified at the hearing and stated that he did not provide many of the requested documents because there was an investigation pending and the "information was not available." *Id.* at 26.  At the hearing, Plaintiff produced a newspaper clipping that outlined a great deal of the facts of the investigation which Defendant Pico read into the record. *Id.* at 39.  Defendant Pico stated at Plaintiff's hearing that Pico would obtain the UI (Unusual Incident) package from Sing Sing Correctional Facility and would review it, share the information that could be shared with Plaintiff, and maintain the confidentiality of the rest. *Id.* at 42.

Later during the hearing, Defendant Pico asked Plaintiff why he wished to call witnesses to prove that Plaintiff was in the visiting room on May 7, 2003, and Plaintiff stated that he believed that corrections officials were trying to accuse Plaintiff of attempting to escape from the visiting room. *Id.* at 43.  Defendant Pico allowed Plaintiff to call another inmate to testify that he and Plaintiff were in the visiting room together on May 7, 2003 when the "code blue" was announced. *Id.* at 48-50.  Defendant Pico eventually obtained the UI report and stated on the record that he reviewed the information contained in the report. *Id.* at 53.  Defendant Pico also discussed parts of the report with Plaintiff. *Id.* at 54-55.

Defendant Seyfert also testified at Plaintiff's second hearing, however, Plaintiff did not hear

that testimony, and the tape recording of that testimony has been maintained as confidential.[5] Plaintiff objected to Defendant Pico's refusal to allow Plaintiff to hear the "confidential" tape, arguing that nothing on the tape was confidential, and that "most of the stuff is already in the newspapers." *Id.* at 62.  Plaintiff also stated that he had already spoken to Defendant Seyfert and that "he explained everything to me that's going on in the case." *Id.*  Plaintiff stated that he only wished to hear the tape so that if Defendant Seyfert were stating something that was not true regarding the investigation, Plaintiff could controvert the statement with documents in Plaintiff's possession. *Id.* at 62-63.

Plaintiff requested that his attorney and his private investigator be called as witnesses, but Defendant Pico denied those requests because the individuals did not have any connection to the incident. *Id.* at 56-58, 62.  After Defendant Pico denied Plaintiff his attorney and private investigator as witnesses, Plaintiff made a very lengthy statement regarding the incidents of May 7, 2003. Plaintiff cited federal case law to the hearing officer, arguing that Plaintiff should not be found "guilty" of the attempted escape. *Id.* at 64-65, 66.

Defendant Pico found, based upon the evidence, including the confidential tape, that Plaintiff should be kept in administrative segregation, but specifically told Plaintiff that he was not finding him "guilty" of committing any particular misbehavior in the visiting room on May 7, 2007. *Id.* at 85-86.  Defendant Pico stated that Plaintiff was still under investigation for the alleged escape attempt from Sing Sing. *Id.* at 86.  Defendant Selsky affirmed the continuation of administrative segregation. Dvorin Decl. Ex. D at 1.

---

[5] A transcript of Defendant Seyfert's testimony has been filed under seal for the Court's review. (Dkt. No. 125).

Defendants have also submitted the periodic administrative review documents. Maly Decl. Ex. B. The initial reviews indicated that administrative segregation was being continued because Plaintiff was under investigation for an escape attempt at Sing Sing. *Id.* at 9-11.[6] The review dated March 5, 2004 states that the Plaintiff was "criminally charged" for an escape attempt at Sing Sing Correctional Facility. *Id.* at 8. All these review documents also state that Plaintiff was exhibiting a positive attitude and good behavior while in Ad Seg. *Id.* at 8-11.

The next review, dated May 3, 2004 stated that although Plaintiff was following staff directions in Ad Seg and showed an "overall positive attitude," he was also caught attempting to smuggle a personal communication concealed in legal work. *Id.* at 6,7. The review document stated that Plaintiff had a hearing regarding this conduct and received a thirty day Special Housing Unit ("SHU") sanction as a result of the guilty finding. *Id.* It was also stated, as had been stated in the previous reports, that his presence in general population could jeopardize the security of the facility. *Id.*

The periodic review report dated July 1, 2004 stated exactly the same reasons for maintaining Plaintiff in administrative segregation. *Id.* at 5. The December 25, 2004 review was identical to the previous report. *Id.* at 4. The February 22, 2005 periodic review document stated that Plaintiff had been "criminally charged" for the escape attempt, and that he was "currently standing trial" for those charges. *Id.* at 3. The recommendation was to continue Plaintiff in Ad Seg. *Id.* On April 22, 2005, the review document states that Plaintiff was found guilty after trial in Westchester County for attempted escape, first degree, among other charges. *Id.* at 2. Again, the recommendation was to continue Ad Seg. *Id.*

---

[6] These reviews were dated July 9, 2003; October 31, 2003; and January 5, 2004.

In addition to Plaintiff's placement in administrative segregation, a "mail watch" was requested by Defendant Maly and approved by Defendant Smith for all of Plaintiff's mail between May 16, 2003 until June 22, 2005, with a review every two months.  All the mail watch orders have been submitted as an exhibit to the Defendants' cross-motion. Smith Decl. Ex. F.  The mail watch request states that Plaintiff was under investigation by DOCS and by the New York State Police for attempting to escape from Sing Sing. *Id.* at 3.

Incoming mail was to be reviewed for any plans for criminal activity and information which, if communicated, would create a security threat. *Id.*  Outgoing mail was going to be reviewed because there was reason to believe that DOCS rules or regulations had been violated. *Id.* Defendant DSS Maly was chosen to monitor the mail, and the mail watch form indicates that legal mail was included. *Id.*  Finally, there is a "note" at the bottom of the page stating that as the mail is received, it should be "immediately" distributed to the inmate unless it contained contraband. *Id.*

Plaintiff also claims that the Defendants responsible for the misbehavior report and disciplinary hearing held against Plaintiff on April 7, 2004[7] violated his due process rights.  On March 27, 2004, Defendant Stokes issued a misbehavior report against Plaintiff for having "authorized articles in an unauthorized area" and "smuggling." Kimler Decl. Ex. A (misbehavior report).  Defendant Stokes stated that he was working in the SHU on March 27, 2004 and was helping to escort Plaintiff to the second floor infirmary for a visit. *Id.*  While going through the legal mail that Plaintiff was taking to the visit, Defendant Stokes found three pages of a personal letter, hidden in a "law firm envelope." *Id.*  The letter was confiscated, and a contraband receipt was

_____

[7] Although the Defendants Exhibits refer to an April 8, 2004 disciplinary hearing, the transcript of the hearing indicates that the hearing took place on April 7, 2004. Dvorin Decl. Ex. G.

issued. *Id.* Defendant Kimler was chosen by Plaintiff as his employee assistant. Dvorin Decl. Ex. D

at 12, 15. Plaintiff was charged with attempting to smuggle a personal letter into the visiting area

inside a legal envelope. The three page letter was an exhibit at the disciplinary hearing and has been

submitted as part of the April 7, 2004 hearing packet in this case. *Id.* at 8-10, 22-24 (duplicate).

At the disciplinary hearing, Plaintiff complained that the hearing was not held within seven

days of the incident, and was therefore, untimely. Dvorin Decl. Ex. G at 4. The hearing officer,

Defendant Gardner, explained to Plaintiff that because he was not "confined" based on the

misbehavior report,[8] prison officials had fourteen days to commence the hearing, and the hearing

was timely. *Id.* Plaintiff's defense to the charge was that he gave the legal envelope in which the

letter was found, to Defendant Stokes when Plaintiff was in his cell, but that Defendant Stokes did

not look in the envelope until they got to the visiting room.[9] Thus, Plaintiff contends that Defendant

Stokes was responsible for bringing the letter into an unauthorized area. *Id.* Plaintiff claimed that if

Defendant Stokes had looked inside the legal envelope when they were still in Plaintiff's cell, he

would never have been charged with this misbehavior. *Id.* Plaintiff later claimed that he did not

even know that the letter to his mother was in the envelope, and that this was a copy of a letter that

Plaintiff had already mailed to his mother, using the regular procedures. *Id.* at 8-9.

Defendant Stokes testified at Plaintiff's disciplinary hearing. *Id.* at 6-10. Defendant Stokes

testified that when he found the letter, he initially told Plaintiff that he would just put the pages back

in Plaintiff's cell, but "then I thought better of it and I said well, I'll let the Sergeant review it. Let

---

[8] Plaintiff was already "confined" to the SHU under administrative segregation, thus, he was
not "confined" pursuant to the misbehavior report.

[9] The court notes that "visiting room" in this particular situation was the second floor
infirmary, where Plaintiff was being taken "for his SHU visit." 4/8/04 Hearing Transcript at p.11.

her make the call." *Id.* at 10.  Defendant Kimler was the sergeant involved, and she also testified at Plaintiff's disciplinary hearing. *Id.* at 11-13.  Sergeant Kimler admitted that when she went over the incident with Plaintiff, he stated that he "forgot it was in there." *Id.* at 13.  Defendant Gardner found Plaintiff guilty of the misbehavior and imposed a penalty of thirty days SHU confinement and loss of various privileges. *Id.* at 17.  Plaintiff appealed the decision, and Defendant Selsky affirmed this disciplinary determination on July 15, 2004.

### B. Cruel and Unusual Punishment

Plaintiff claims that between September 26, 2003 and October 10, 2004, Defendant Karamanos harassed Plaintiff by kicking Plaintiff's cell door every half hour while Plaintiff was trying to sleep. AC ¶ 55.  Plaintiff claims that at unspecified times during this period, Defendant Karamanos also refused to give Plaintiff soap, writing paper, and tissue. *Id.*  Plaintiff also claims that Defendant Karamanos spit in Plaintiff's food and threatened to kill Plaintiff. *Id.*  Plaintiff alleges that Defendant Smith violated Plaintiff's right to be free of cruel and unusual punishment by failing to protect Plaintiff against Defendant Karamanos's conduct. AC ¶ 62.

Plaintiff claims that Defendant Smith further violated Plaintiff's Eighth Amendment rights by refusing to return Plaintiff's typewriter and reading lamp after learning of "excessive pains" in Plaintiff's hands due to the great deal of writing that Plaintiff had to do "because of his confinement" and after learning of Plaintiff's "eye pains."  AC ¶¶ 63-64.  Defendant Smith is also alleged to have forced Plaintiff to shave with a razor instead of an electric shaver; denied Plaintiff adequate laundry services and refused to provide Plaintiff with a "reasonable alternative" to the prison laundry. AC ¶¶ 65-66.  Plaintiff blames Defendant Smith for causing Plaintiff's mild stroke on November 4, 2003. AC ¶ 53.  Plaintiff claims that Defendant Smith caused a "stressful situation"

14

when he prevented Plaintiff from proving his innocence at his "disciplinary hearing" and by directing Defendant Maly to conduct "sham" reviews of Plaintiff's placement in administrative confinement.

Plaintiff alleges that on March 2, 2004, Defendant Koemm violated Plaintiff's Eighth Amendment rights by forcing Plaintiff to come out of his cell at 7:00 a.m. and demanding that Plaintiff walk more than 100 feet in the cold while wearing only underwear in front of other inmates and female officers. AC ¶ 57. Plaintiff claims that Defendant Koemm also violated Plaintiff's Eighth Amendment rights on July 27, 2004 by refusing to feed Plaintiff for more than eleven hours and keeping Plaintiff in shackles for more than eleven hours. AC ¶ 58.

Plaintiff claims that prior to August 23, 2003, he asked Defendant Smith several times to transfer Plaintiff from the SHU area due to threats he had received from other inmates. AC ¶ 51. Plaintiff states that Defendant Smith refused to move Plaintiff, and because of Defendant Smith's failure to protect Plaintiff, he was assaulted by another inmate who threw urine and feces at Plaintiff on August 23, 2003. AC ¶ 51. Plaintiff also claims that Defendant Lutz subjected Plaintiff to cruel and unusual punishment after this incident because Defendant Lutz did not allow Plaintiff to shower for forty five minutes after the assault. AC ¶ 52.

**C. Visitation and Access to Courts/Counsel**

Plaintiff alleges that on May 25, 2003, Defendant Smith violated Plaintiff's right to "visitation of choice" by denying Plaintiff a visit with his clergyman, Minister James Willis.[10] AC ¶

---

[10] Plaintiff also claims that Defendants John Doe 1 and John Doe 2 harassed Minister Willis when he attempted to visit Plaintiff. AC ¶ 47. Although the claim that Plaintiff's rights may have been violated by denial of his visitor may be actionable, to the extent that the amended complaint could be read as alleging the harassment of his visitor, Plaintiff cannot raise or recover for the rights of others in this action. *See Nguyen Thang Loi v. Dow Chem. Co.*, 373 F. Supp.2d 7, 50 (E.D.N.Y.

47.  Plaintiff also alleges that Defendant Smith denied Plaintiff a visit with his attorney on June 18, 2003. AC ¶ 48.  Plaintiff claims that Defendant Smith violated Plaintiff's attorney-client privilege by initiating the mail watch and opening all of Plaintiff's legal mail. AC ¶ 49.  Plaintiff claims that Defendant Smith denied Plaintiff a legal telephone call on an unspecified date. AC ¶ 50.  Plaintiff also alleges that Defendant Koemm violated Plaintiff's rights by "not allowing Plaintiff to speak with his attorney in private." AC ¶ 74.

### D. Retaliation

Plaintiff claims that Defendant Kimler retaliated against Plaintiff for filing legal claims against her peers by taking Plaintiff's legal books and refusing to return them to him. AC ¶ 67.  Defendant Kimler has filed an affidavit in which she states that on August 3, 2004, Corrections Officer Cusack[11] performed a routine cell search of Plaintiff's SHU cell. Kimler Aff. ¶ 5.  As a result of that search, Officer Cusack confiscated, among other things, books and magazines that were "in excess of the number of items allotted SHU inmates." *Id.*

Defendant Kimler states that the excess books and magazines were placed in Plaintiff's personal property box according to DOCS Directives. *Id.* ¶ 5 & Ex. B.  One of the books, entitled Prisoner Self-Help Litigation Manual, was returned to the facility Law Library, and a bible was returned to Plaintiff. *Id.*  Officer Cusack did not issue a misbehavior report, but Plaintiff complained about the confiscation of materials, so Defendant Kimler investigated the matter. *Id.*  Defendant Kimler states that she asked the Law Library Officer what books were signed out to Plaintiff. *Id.*

---

2005)(citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)).  In any event, Plaintiff has neither identified nor served either John Doe.

[11] Officer Cusack is not a Defendant in this case.

The Law Library Officer sent Defendant Kimler a memorandum listing two books signed out by Plaintiff, neither of which was the Self-Help Manual. *Id.*

Although Plaintiff claims that the Self-Help Manual was sent to him by his mother, Defendant Kimler states that the book was clearly stamped "SHU" in large letters on the front and on the binding of the book. *Id.* ¶ 6. Defendant Kimler asserts that the items were not confiscated because they posed a threat to security or because Plaintiff sued other officers in the facility, but rather because the items were in excess of the amount allowed in an SHU cell. *Id.* ¶¶ 6, 7.

### E. Grievances

Plaintiff's amended complaint also names Thomas Eagen, Director of the Inmate Grievance Program. Plaintiff filed grievances regarding Defendant Smith's alleged refusal of the telephone call to Plaintiff's lawyer, and the denial of Minister Willis's visit. Plaintiff also filed a grievance regarding Defendant Karamanos's alleged behavior, although in Plaintiff's claims against Defendant Eagen, he does not mention Eagen's affirmance of the denial of the Karamanos grievance.

Defendant Eagen has submitted an affidavit in support of the Defendants' cross-motion for summary judgment. In the affidavit, Defendant Eagen states that although he is the Director of the Inmate Grievance Program (IGP), he has no vote in the Central Office Review Committee's (CORC) determination of specific grievances. Eagen Aff. ¶ 6. Defendant Eagen is responsible "solely for the administrative functions of the IGP and CORC." *Id.*

### 3.     <u>Due Process</u>

Plaintiff in this case has five distinct due process claims. First, Plaintiff alleges that his placement in administrative segregation violated due process. Second, Plaintiff alleges that the periodic reviews conducted while he was in administrative segregation were "shams" and

violated due process.  Third, Plaintiff alleges that the Defendants involved in his disciplinary

hearing for smuggling violated his due process rights in connection with that hearing.  Fourth,

Plaintiff alleges that Defendant Eagen violated due process when affirming the denial of

Plaintiff's grievances regarding his legal call, legal visit, and his visit from Minister Willis.

Finally, Plaintiff alleges that Defendant Daughtry violated Plaintiff's due process rights by falsely

reporting to Defendant Smith that Plaintiff was under investigation for escape, and later by

arresting Plaintiff without probable cause.

### A.  Administrative Segregation Placement

In order to begin a due process analysis, the court must determine whether Plaintiff had a

protected liberty interest in remaining free from the confinement that he challenges and then

determine whether the Defendants deprived Plaintiff of that liberty interest without due process.

*Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir.

1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty

interests protected by due process, "these interests will be generally limited to freedom from

restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to

protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and

significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v.

Conner*, 515 U.S. 472, 483-84 (1995).

The Second Circuit has *implied* that whether a deprivation is atypical and significant

involves fact finding.  *See Frasier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996)("[t]he extensive

fact-finding of the district court permits us to measure Frasier's SHU claim by the standard of

*Sandin*); *Samuels v. Mockry*, 77 F.3d 34, 38 (2d Cir. 1996)(assessment as to whether inmate had

a protected liberty interest may require fact finding).  The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

The Second Circuit has discussed the duration element of the *Sandin* analysis. *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000).  In *Colon*, the court discussed whether it was appropriate to have a "bright line" rule regarding the maximum length of confinement in the Special Housing Unit (SHU) before a liberty interest might be created. *Id.*  The court concluded that 305 days in SHU would meet the standard. *Id.* at 231.  Although Judge Newman believed that the court should articulate a bright line rule, holding that any SHU confinement less than 180 days would not create a liberty interest, the panel disagreed. *Id.* at 234.  The court also noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.*  at 231 (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).

In this case, there appears to be no question that Plaintiff had a liberty interest in remaining free of the confinement to which he was subjected.  Plaintiff states in his motion for summary judgment that he was in Ad Seg in SHU from May 15, 2003 until July 20, 2005, over two years. Plaintiff's Declaration ¶ 25 (Dkt. No. 105).  Thus, the question to be determined is whether Plaintiff was afforded the process he was due prior to, and during the continued imposition of this confinement.  Plaintiff argues that he was not afforded due process.

In *Hewitt v. Helms*, 459 U.S. 460, 469-76 (1983), the Supreme Court held that when a liberty interest is created, an inmate must be afforded procedural protections prior to being

19

transferred into the more restrictive confinement.[12]  Under *Hewitt*, an inmate placed in administrative segregation must receive some notice of the charges and an opportunity to present his views to the prison official charged with deciding whether to transfer the inmate to administrative segregation. 459 U.S. at 476.

Prison officials must conduct an "informal nonadversary evidentiary review" of the information supporting the inmate's administrative segregation, and this review must take place within "a reasonable time following an inmates' transfer." *Id.* at 486 & n.8.  *Hewitt* also requires that there be periodic reviews after an inmate's placement in administrative segregation, such that the placement is not "a pretext" for indefinite confinement. *Id.* at 477.  A "pretextual" administrative confinement may be raised as a separate constitutional violation. *See Soto v. Walker*, 44 F.3d 169, 173 n.4 (2d Cir. 1995)(citing *Hewitt*, 459 U.S. at 477 n.9).

The DOCS regulations provide that the substantive predicate for an inmate's transfer to administrative segregation is that the inmate's presence in the general population would pose a threat to the safety and security of the facility. NEW YORK CODE RULES & REGS. tit. 7, § 301.4(b)(NYCRR).  The regulations also require that administrative segregation inmates receive the same type of hearing as those inmates who are transferred to SHU for disciplinary reasons. 7 NYCRR 301.4(a).  The hearing must take place within 14 days of the inmate's admission to SHU, after issuance of the administrative segregation recommendation "made by the employee

---

[12] Although the standard for determining whether a liberty interest is created is now governed by *Sandin*, rather than by *Hewitt*, the standard for determining the process that is due after a liberty interest has been created remains the same. *See Wilkinson v. Austin*, 545 U.S. 209, 229 (2005)(stating that although *Sandin* abrogated the methodology for establishing the liberty interest articulated in *Hewitt* and in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979), those cases "remain instructive for their discussion of the appropriate level of procedural safeguards").

who ascertained the facts or circumstances." *Id.*

There are several state law requirements for the hearing. The inmate must receive written notice of the reason for his confinement; he must be afforded an employee assistant if he is confined to SHU pending the hearing; the hearing officer must be impartial; the inmate must be allowed to attend the hearing; and he must be permitted to submit documents and call witnesses unless the hearing officer finds that they are redundant or irrelevant. 7 NYCRR §§ 254.1, 251-4.1, 254.5, 254.6(a)(3). The hearing must be electronically recorded and must be completed within 14 days. *Id.* §§ 251-5.1(b), 254.6(b). Finally, the hearing officer must render a written decision, setting forth the basis for his determination; the inmate must receive a copy of the determination and must be told of his right to appeal. *Id.* §§ 254.7(a)(5), 254.8.

In this case, Plaintiff claims that Defendant Seyfert violated Plaintiff's due process rights by ordering Defendant Smith to place Plaintiff in administrative segregation. As stated above, Defendant Smith takes full responsibility for Plaintiff's placement, and Defendant Seyfert was only involved to the extent that he informed Defendant Smith of the facts of the case and the pending investigation. Although Plaintiff continues to maintain that this was false information, it is clear that the information regarding the investigation was correct.

Plaintiff makes the same claim against Defendant Daughtry. The "false" information allegedly conveyed by Defendant Daughtry was the fact that an escape was being investigated and it was believed that Plaintiff may have been involved in the plan. Clearly, the information was not "false" since Plaintiff was ultimately convicted of participation in the escape plan. It was based on this information that Defendant Smith instructed Defendant Lutz to prepare an "Administrative Segregation Recommendation," approved by Defendant Maly, and served on

Plaintiff on May 17. 2003. Smith Decl.¶ 9 & Ex. A.

Defendant Smith outlines the basis for his decision to transfer Plaintiff to Ad Seg pending a hearing. Smith Decl. ¶¶ 6-8.  Because the escape attempt involved a visitor, smuggling of uniforms, falsifying credentials, and the development of a relationship with a corrections officer in furtherance of the escape attempt, Defendant Smith believed that it would be important to be able to supervise Plaintiff more closely and to restrict his access to potential accomplices, visitors, and other forms of communication. *Id.*  These concerns are valid bases for imposing administrative segregation pending a formal hearing.

Plaintiff was served with the Ad Seg report, clearly indicating that he was under investigation for an escape attempt at Sing Sing. Smith Decl. Ex. A.  Thus, Plaintiff was informed of the basis for his confinement, and the Ad Seg Recommendation specifically informed Plaintiff that he would have a full hearing with the due process rights afforded to inmates facing disciplinary proceedings within 14 days of the Ad Seg recommendation. *Id.*  The recommendation further states that "[i]f restricted pending a hearing on this recommendation, you may write the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement." *Id.*

Thus, in accordance with *Hewitt*, Plaintiff received notice of the administrative segregation placement, together with the reason for the placement and was afforded the opportunity to be heard even prior to the hearing if he chose to avail himself of the opportunity. Thus, Plaintiff's due process rights were not violated in conjunction with his initial placement in administrative segregation.  Plaintiff was afforded a hearing which commenced on May 22, 2003, well within the 14 days from the service of the Ad Seg Recommendation on Plaintiff.  Any due

22

process claims relating to Plaintiff's initial placement in SHU pending his hearing must be dismissed.

Plaintiff also argues that he was denied due process at both administrative segregation hearings. AC ¶¶ 68.  With respect to the first hearing, (May 22-25, 2003), Plaintiff alleges that Defendant Wilkins failed to properly assist Plaintiff by refusing to provide him with requested documents.  Plaintiff also alleges that Defendant Squillace denied Plaintiff the right to call witnesses, denied him the right to view documentary evidence, denied Plaintiff a fair hearing, and upheld the administrative segregation recommendation without sufficient evidence.  Plaintiff also alleges that Defendant Selsky denied Plaintiff due process when he allowed a second hearing to take place after reversing the first one.

A review of the May 22-25, 2003 hearing transcript shows that Plaintiff was attempting to present evidence that would show his "innocence" of the escape charge, and Defendant Squillace was trying to explain that he was not determining whether Plaintiff was innocent or guilty of the attempted escape, but rather whether Plaintiff should be confined to administrative segregation because of a security threat. May 22-25, 2003 Hearing Transcript at 16, 18.  The fact that the investigation was still pending was Defendant Squillace's basis for upholding the recommendation. *Id.* at 17.  At the continuation of his hearing on May 25, 2003, Plaintiff stated that his family and his attorney were doing their own investigation into the allegations, and Plaintiff stated that his name was not listed anywhere in the "reports." *Id.* at 20.  Plaintiff appeared to be aware of a great deal more information than the hearing officer. *Id.* at 21.

Plaintiff was clearly afforded the ability to respond to the Ad Seg recommendation at the hearing.  Plaintiff argued that he had not "done anything wrong" or broken any departmental

23

rules, so he should not be placed in administrative segregation. *Id.* at 23.  Plaintiff attempted to argue that he was not an escape risk and that it would be impossible to escape from the facility, whether he were in general population or in SHU. *Id.* at 24.  He also argued that he could be placed in Involuntary Protective Custody (IPC), and that if so, he could get additional visitation rights and could conduct his own investigation into the escape attempt. *Id.* at 25.

For the May 22-25, 2003 hearing, Plaintiff had requested various documents from Defendant Wilkins. Plaintiff's Ex. B at 1 (attached to Dkt. No. 105).  Plaintiff requested copies of, among other things, the Unusual Incident Report; all "To and From" reports; the name of the individual who authorized Plaintiff's cell search; copies of his own records; copies of DOCS Directives; the investigative reports of the attempted escape; any "confidential reports" from staff and inmates; statements of anyone arrested as a result of the incident; "[a]ll log book entries;" copies of Plaintiff's visiting, clothing, sneaker, and commissary lists; and Plaintiff wished to know whether he was on a "mail watch" and why his visitors were being denied access to the facility. *Id.*

Defendant Wilkins responded by providing some documents, such as Plaintiff's own disciplinary history, the DOCS Directives, and Plaintiff's visiting list. *Id.* at 2.  The documents relating to the investigation of the escape attempt were denied to Plaintiff because they were "confidential" to the on-going investigation. *Id.*  Although there were witnesses listed on this exhibit, Defendant Wilkins stated that the witness requests would be handled by the hearing officer. *Id.* at 1-2.  The hearing officer, Defendant Squillace, did not call any of Plaintiff's proposed witnesses which included his criminal attorney and various other individuals. *Compare* Plaintiff's Ex. B at 1 *with* Dvorin Decl. Ex. E (May 22-25, 2003 Hearing Transcript) at 14-15.

Defendant Squillace found that Plaintiff should remain in administrative segregation because his presence in general population would present a risk to the facility order and security based upon the fact that Plaintiff was under investigation for an escape attempt at Sing Sing. May 22-25, 2003 Hearing Transcript at 29.  Plaintiff was clearly told of his right to appeal. *Id.*

On Appeal, Defendant Selsky reversed this determination based on insufficiency of evidence, but remanded the case for a new hearing.  Plaintiff alleges that the reversal shows that he was subjected to constitutional violations by Squillace and Wilkins, and also argues that Defendant Selsky violated Plaintiff's due process rights by remanding the case for a new hearing rather than reversing the matter outright.

The standard for sufficiency of evidence in the prison administrative or disciplinary context is "some" or "a modicum" of evidence to support the hearing officer's decision. *Johnson v. Goord*, 04 Civ. 5919, 2007 U.S. Dist. LEXIS 22992, *10 (S.D.N.Y. March 28, 2007)(citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).  The state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin*, 76 N.Y.2d 964, 563 N.Y.S.2d 728, 565 N.E.2d 477 (1990).  This stricter standard is not applicable to federal due process claims, and it has been held that the reversal of a disciplinary ruling on administrative appeal for insufficient evidence does not necessarily establish a plaintiff's federal due process claim. *See Sira v. Morton*, 380 F.3d 57, 76 n.9 (2d Cir. 2004).

In this case, while it is true that the evidence before Defendant Squillace was minimal, there certainly was evidence that Plaintiff was under investigation for an escape attempt at Sing Sing.  Thus, the fact that Defendant Selsky sent the case back for a second hearing does not show

25

that Plaintiff's due process rights were violated by Defendant Squillace, and it does not show that Defendant Selsky's remand for a second hearing in any way violated Plaintiff's due process rights.

With respect to the denial of documentary evidence and witnesses, the Court notes that Plaintiff was attempting to call witnesses who would testify that Plaintiff had a pending challenge to his criminal case[13] and, therefore, he would not try to escape and "ruin" his life. These witnesses were not relevant to the issue of whether Plaintiff was a danger to the security of the institution, and, therefore, were properly denied by Defendant Squillace. Additionally, it is clear that the documentary evidence was part of a continuing criminal investigation, and thus, was not available for Plaintiff to examine.

Although Plaintiff claims that Defendant Maly testified "falsely" that Plaintiff was under investigation, there is no basis for this claim. Plaintiff might be attempting to claim that Maly, and in the second hearing, Defendant Lutz, had no "personal" knowledge of the investigation and had only signed the administrative segregation recommendation because they were told to do so by Defendant Smith. However, it is clear that Plaintiff was under investigation for his involvement in the attempted escape at all times relevant to the incidents in this case. In any event, as argued by Defendants, Plaintiff has no due process right to be free from false accusations as long as the hearing comports with due process. *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988).

At the second hearing, additional evidence was presented to support the administrative

_____

[13] The criminal case to which Plaintiff is referring is the conviction for which he was incarcerated at the time of the escape attempt, not the prosecution for the escape attempt.

segregation determination.  Defendant Seyfert testified outside of Plaintiff's presence.  A

transcript of Defendant Seyfert's testimony has been submitted as a confidential exhibit to

Defendants' motion for summary judgment. (Dkt. No. 125).  A review of the exhibit shows that

there was substantial evidence of Plaintiff's connection to the escape that was never completed

because the individual who entered the prison to assist in the escape left before completing his

task.

     The additional confidential materials alone would have justified Plaintiff's placement in

administrative segregation.  Once again, Plaintiff claims that the hearing officer, Defendant Pico,

and Plaintiff's employee assistant, Defendant Chiapparino, violated Plaintiff's due process rights.

Defendants have submitted both the transcript of the August 29, 2003 rehearing and the Hearing

Packet containing all the documents associated with the re-hearing and Plaintiff's appeal of the

determination made at the re-hearing. Dvorin Decl. Exs. C (hearing packet) & F (hearing

transcript).

     Although Plaintiff claims that Defendant Chiapparino violated Plaintiff's rights by

refusing to obtain documentary evidence for him, Defendant Chiapparino would have been

unable to obtain confidential investigation documents from either the New York State Police, any

other law enforcement agency, or from the District Attorney's Office that was handling the

criminal investigation and prosecution.

     The Court also notes that the purpose of the employee assistant is to obtain documents for

an inmate who would otherwise be unable to obtain the documents himself. *See Eng v. Coughlin*,

858 F.2d 889, 897-98 (2d Cir. 1988).  Plaintiff was afforded a substantial second hearing in this

case.  The transcript is ninety pages long.  At the beginning of the hearing, Defendant Pico

carefully reviewed Plaintiff's request for documents and witnesses from Defendant Chiapparino.

August 29, 2003 Hearing Transcript at 4-5.  Defendant Pico also indicated which requests were

refused.  A review of these requests shows that Plaintiff was completely aware of what was

alleged to have happened on May 7, 2003 since Plaintiff requested the name of the man who

allegedly attempted to enter Sing Sing. *Id.* at 4.

Plaintiff complained at the hearing that he was denied documents. *Id.* at 11.  Defendant

Pico then asked Plaintiff to state why the documents would be relevant.  Plaintiff told Defendant

Pico that he had a lawyer who was investigating the case and that he had a private investigator

also investigating the case. *Id.* at 12.  Plaintiff stated that his lawyer and private investigator

already had all the documents that Plaintiff requested from his employee assistant. *Id.*  Plaintiff

also stated at the hearing that his attorney came to the facility and showed Plaintiff the

documents. *Id.*

Defendant Pico pointed out to Plaintiff that if Plaintiff had already seen the documents in

question, the only thing missing was for the hearing officer to see them, because if the documents

had been produced by Defendant Chiapparino, Plaintiff would simply be presenting the

documents to Defendant Pico to "prove [his] point." *Id.*  Defendant Pico sent Plaintiff back to his

cell to obtain documents that he had been given. *Id.* at 15-16.  Plaintiff argued that the documents

showed that on the day of the attempted escape, he was in the visiting room in front of 17

corrections officers, and that Plaintiff did not try to escape. *Id.* at 17.  Plaintiff then stated that he

wished to call the corrections officers that were working on that date to testify that Plaintiff did

not attempt to escape, and thus, there was no need to put Plaintiff in administrative segregation.

*Id.*  Later, however, Plaintiff implied that as long as Defendant Pico saw the documents, Plaintiff

did not need the witnesses. *Id.*

Based on the testimony at the second hearing, it is clear that Plaintiff was well aware of the information that he needed to respond to the administrative segregation recommendation. Regardless of whether Defendant Chiapperino was able to obtain the documents requested, Plaintiff had the opportunity to defend himself because he had access to the documents himself.[14] Thus, Defendant Chiapperino did not deny Plaintiff due process prior to the second hearing in failing to produce confidential documents at Plaintiff's request.

Defendant Chiapperino was called as a witness at the hearing. *Id.* at 26-28.   Plaintiff argued that during a conversation with Plaintiff, Defendant Chiapperino implied that the outcome of the hearing was prejudged against Plaintiff. *Id.* at 26.  However, Defendant Chiapperino testified that he and the Plaintiff did not have "a conversation to that effect." *Id.*  Defendant Chiapperino also testified that he could not obtain the documents that Plaintiff requested because they were part of an ongoing investigation. *Id.* Plaintiff was allowed to call other witnesses to testify at the hearing, *id.* at 36-38, including another inmate who allegedly heard a conversation between Defendant Chiapperino and Plaintiff.  The Court also notes that Defendant Pico agreed to get the Unusual Incident Report from Sing Sing and review it himself, even if Plaintiff was not allowed to see it. *Id.* at 42-43.  Defendant Pico also agreed to share any non-confidential portions with Plaintiff. *Id.*  Plaintiff continued to be confused that Defendant Pico was going to find Plaintiff "guilty" of the attempted escape, and continued to argue that he was innocent of the attempted escape because he did not commit any misbehavior in the visiting room on the day in

_____

[14]Plaintiff also had a newspaper clipping relating the facts of the incident at Sing Sing. *Id.* at 22.

question. *Id.* at 65-67.

Defendant Pico initially denied two witnesses who would have allegedly testified that Plaintiff did not commit any misbehavior in the visiting room on May 7, 2003.  There was no reason to call these witnesses because Defendant Pico agreed that Plaintiff did not commit any misbehavior in the visiting room, although he did eventually call one of the officers because he was available, and "it didn't hurt." *Id.* at 82-85.  Defendant Pico later read his findings into the record. *Id.* at 85-86.  Defendant Pico repeated his reasons for refusing to call Plaintiff's attorney and private investigator based on lack of relevance, and found that Plaintiff's presence in general population would be a threat to the safety and security of the facility. *Id.* at 86.

Plaintiff was informed of his right to appeal. *Id.* at 89.  Defendant Pico also informed Plaintiff that his status in Administrative Segregation would be reviewed every sixty days. *Id.* at 88.  The hearing concluded on September 4, 2003. *Id.* at 89.  Plaintiff appealed Defendant Pico's determination, and on November 13, 2003, the determination was affirmed by Defendant Selsky. Dvorin Decl. Ex. C (8/29/03 Hearing Packet) at 1.

Based on all the evidence presented, this Court finds that no due process violations occurred at the re-hearing of Plaintiff's administrative segregation status.  Plaintiff was given notice of the reason for the hearing, and during the several day hearing, he was given the opportunity to call witnesses and to present evidence on his behalf.  The fact that Defendant Chiapperino could not obtain some of the documents because they were confidential investigative documents did not deny Plaintiff due process, particularly in view of the fact that Plaintiff stated himself that he had an attorney and an investigator who had obtained documents for him.

Defendant Pico was justified in denying some of Plaintiff's witnesses as irrelevant.

30

Plaintiff requested that his criminal defense attorney and his private investigator be called to testify.  Plaintiff was confused, however, regarding the purpose of the hearing.  The issue was not whether Plaintiff was guilty or innocent of the escape attempt, but rather whether he was a risk to the safety and the security of the facility.  Thus, there was no purpose in calling these witnesses.[15] In any event, as stated above, the required constitutional due process for administrative segregation is only that Plaintiff be given some notice and opportunity to be heard. *Hewitt, supra*. Although New York State law affords an individual who is admitted to administrative segregation the same rights as an individual who is being charged with a disciplinary infraction, the Court need only consider whether the minimum constitutional due process was provided.  A review of the evidence in this case shows that the minimum due process was provided by Defendants Chiapperino, Pico, and Selsky in connection with Plaintiff's second administrative segregation hearing.

Finally, Plaintiff alleges that his hearings were not "impartial."  An inmate is entitled to a hearing officer who does not "prejudge the evidence and who cannot say . . . how he would assess evidence he has not seen yet." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996)(citing *inter alia Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).  Prison hearing officers, however, "are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *inter alia Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1994)).

Plaintiff attempted to show that the outcome of the hearing had been prejudged. Dvorin

---

[15] Defendant Pico did call some of the witnesses requested by Plaintiff who were corrections officers in the visiting room. Dvorin Decl. Ex. F at 83.  Lieutenant Seward did not remember whether Plaintiff was in the visiting room on May 7, 2003, although Lt. Seward did know who the Plaintiff was. *Id.*

Decl. Ex. F at 26-32.  Defendant Chiapperino was called as a witness and asked whether he had

ever had a conversation with Plaintiff, stating that the officials would "probably . . . keep

reversing this," and implying that the decision had already been made regarding Plaintiff's status.

*Id.* at 27.  Defendant Chiapperino denied that the conversation took place as Plaintiff stated. *Id.* at

29.  Corrections Officer Stokes was called as a witness and asked whether he heard such a

conversation between Defendant Chiapperino and Plaintiff. *Id.* at 29.  Officer Stokes was present

at the meeting between Defendant Chiapperino and Plaintiff but testified that he did not hear any

such conversation between the two. *Id.*

There is no evidence from which a fact finder could reasonably conclude that the hearing

officers in this case were not impartial or had in some way prejudged the evidence.  It was clear

at the first hearing that Defendant Squillace did not know very much about the case at all, and at

the second hearing Defendant Pico went out of his way to obtain evidence in order to make an

informed decision.  Thus, Plaintiff's claims that he did not have impartial hearing officers or

impartial hearings are dismissed.

The Court finds that Plaintiff's initial placement in administrative segregation was proper

and any due process claims against any Defendants in connection with Plaintiff's initial

placement in administrative segregation, whether in relation to the first hearing or to the

rehearing are dismissed.  This includes claims against Defendants Seyfert, Daugherty, Lutz,

Maly, Wilkins, Squillace, Chiapperino, Pico, Selsky, and Goord.

### B.  Periodic Review of Ad Seg

In addition to the requirement that the inmate be given notice and an opportunity to be

heard prior to being placed in administrative segregation, prisoners confined to administrative

segregation must be given periodic reviews of their confinement so that administrative

segregation is not used as a pretext for indefinite confinement of the inmate. *Hewitt*, 459 U.S. at

477 n.9.  Those periodic reviews must be "meaningful." *See Doe v. Simon*, 221 F.3d 137, 139 (2d

Cir. 2000)(a fundamental requirement of due process is the opportunity to be heard at a

meaningful time and in a meaningful manner)(citing *Mathews v. Eldridge*, 424 U.S. 319, 333

(1979)).  The question of periodic review is a due process claim, separate from the claim for the

initial placement in administrative segregation. *See e.g. Blake v. Coughlin*, 92-CV-1351, 2006

U.S. Dist. LEXIS 55319, *14-17 (N.D.N.Y. Aug. 8, 2006)(although it had been determined that

Plaintiff's initial placement in administrative segregation was lawful, the constitutionality of the

periodic reviews was an issue at trial).

      Plaintiff in this case claims that the periodic reviews of his administrative confinement

conducted by Defendant Maly were a "sham." AC ¶ 70.  Defendant Maly's declaration states that

an inmate's periodic review in administrative segregation is now governed by a formal

procedure, conducted every sixty days. Maly Decl. ¶ 4 (citing DOCS Directive 4933).  This

procedure was established in November of 2002, and was made part of the regulations appearing

at 7 N.Y.C.R.R.  § 301.4(d).

      According to the regulations, the periodic reviews are made by a three-member panel,

consisting of a representative of the facility executive staff, a security supervisor, and a member

of the guidance and counseling staff. *Id.* § 304.1(d)(1).  The panel examines the inmate's

institutional record and submits a recommendation to the Superintendent, who makes the final

determination. *Id.* § 301.4(d)(2).

      In making the recommendation, the panel considers the reasons why the inmate was

initially determined to be appropriate for administrative segregation; information on the inmate's subsequent behavior and attitude; and any other factors that the panel believes would weigh either in favor of or against keeping the inmate in administrative segregation. *Id.* § 301.4(d)(1)(i)-(d)(1)(iii).

In this case, the periodic reviews of Plaintiff's administrative segregation status have been submitted as Exhibit B to the Maly Declaration.  As stated above, the reviews initially state that Plaintiff was under investigation for the escape attempt, then they state that Plaintiff had been charged criminally for the escape attempt, that he was later on trial, and finally that he was convicted of the criminal charges.  In the May 3, 2003 review, the panel included the information regarding Plaintiff's disciplinary charge for smuggling.  Regardless of Plaintiff's good behavior in administrative segregation/ SHU, the reviewers continued to find that Plaintiff was a threat to security.

The fact that the reports contain similar language does not necessarily mean that the reviews were a "sham."  In any event, Defendant Maly was only one of three individuals who considered Plaintiff's case at each review, in addition to the Superintendent making the final determination.  The initial reason for Plaintiff's placement in administrative segregation was that he was suspected of being involved in the attempted escape.  As time passed, the investigation continued to the point where Plaintiff was criminally charged with the attempted escape.  His security risk did not change.  If anything, as more information surfaced, the security risk may have increased, and the fact that he was found guilty after a trial indicates that the risk was real.  Thus, the fact that the initial reason for Plaintiff's placement in administrative segregation was used later as a reason to keep Plaintiff in administrative segregation did not make the panel's

34

review a "sham."

   In his response, Plaintiff submits a decision by state trial court Justice Robert DiBella. Plaintiff's Ex. Y.  Prior to his criminal trial on the escape charges, Plaintiff moved to suppress a recorded statement that he gave to Defendant Daughtry in which Plaintiff admitted his involvement in the escape attempt.  Justice DiBella suppressed the statement, finding that the continuation of Plaintiff's administrative segregation could have been coercive, and that the People had not met their burden of proof beyond a reasonable doubt that the statement was voluntary. *Id.* at 4-7.

   Justice DiBella also found that evidence was "lacking" with respect to the decisions made to continue Plaintiff in administrative segregation. *Id*. at 6.  Judge DiBella did state that it was "clear that in the days and weeks following the attempted escape, prison authorities had a clear and legitimate need to segregate Defendant from the general inmate population for investigative and security purposes. . . . However, the People failed to establish the continued institutional need for Defendant's Ad Seg status in the months after the attempted escape." *Id.*  Justice DiBella also found that although courts generally defer all matters of internal security to prison authorities, the evidence of extended confinement was relevant to show that Plaintiff's confession was coerced through undue deprivation and promises to release Plaintiff from that deprivation. *Id.* at 7.

   In making these findings, Judge DiBella also found that "on balance" the prosecutor's witnesses were "more credible" than the Plaintiff's witnesses, however, there were gaps in the testimony and gaps in the recording of Plaintiff's statement. *Id.* Thus, the prosecution had not shown that Plaintiff's statement was voluntary beyond a reasonable doubt. *Id.*

Although Plaintiff may be attempting to argue that Judge DiBella's decision shows that the Plaintiff's reviews were merely a "sham" to keep Plaintiff in administrative segregation until he confessed to the attempted escape, the Court does not agree. The standard of proof for determining whether Plaintiff's statement was voluntary is completely different than the standard of proof to determine whether Plaintiff was afforded due process relating to his administrative segregation review. Judge DiBella had to find that the Plaintiff's statement was voluntary beyond a reasonable doubt, whereas the standard to uphold a continuing administrative segregation is merely whether the review was "meaningful," including whether the reviewers were unbiased.

In *Tellier v. Scott*, the court stated that if the reason for Plaintiff's placement in administrative segregation was his escape risk at the time of his placement, then the periodic review must consider any information relating to a change in petitioner's risk of escape. *Tellier v. Scott*, 94 Civ. 3459, 2004 U.S. Dist. LEXIS 1493, *28-29 (S.D.N.Y. Feb. 5, 2004). The court stated that officials are not permitted to ignore relevant information as it becomes available. *Id.* at *29.

Defendant Maly's affidavit notes that the periodic reviews are performed by a panel, and the panel in this case relied upon the "changing circumstances" of the investigation as it progressed until Plaintiff was charged, and later, convicted of his involvement in the attempted escape. Maly Decl. ¶ 10. The panel also considered Plaintiff's disciplinary conviction for the attempted "smuggling" of the personal letter in his legal mail. *Id.* While Plaintiff argues that the charge was unnecessary, that he had placed the personal letter in the legal envelope by mistake, and that the officer should have searched the envelope prior to arriving at the visiting room, it

36

must be remembered that Plaintiff was being investigated for a sophisticated scheme to escape from the facility.  The scheme involved smuggling information and contraband in and out of the facility.  The fact that Plaintiff could have been attempting to smuggle a personal letter, whether harmless or not, would impact upon a determination of whether the inmate was still a threat to security.

The Court finds that Defendants have shown that there is no question of fact regarding whether they conducted a "meaningful" review of Plaintiff's administrative segregation status, and Plaintiff's due process claims regarding the periodic administrative segregation review must be dismissed as against Defendant Maly.

### C.  Contraband Smuggling Charge

Plaintiff also alleges due process violations in connection with the charge that he attempted to smuggle a personal letter in a legal envelope.  Plaintiff claims that Defendant Stokes filed a false misbehavior report, Defendant Kimler violated Plaintiff's due process rights by "directing" Defendant Stokes to file the false report, and Defendant Gardner violated Plaintiff's due process rights by finding Plaintiff guilty of the allegedly false charge based upon insufficient evidence.  Plaintiff received a thirty-day SHU disciplinary sentence for the violation.

Based on *Sandin, supra,* Plaintiff's thirty-day disciplinary sentence in SHU does not rise to the level of an atypical and significant deprivation sufficient to create a liberty interest. Nevertheless,  Plaintiff was afforded all the process he was due.  Kimler Decl. Exs. A, B, Dvorin Decl. Ex. G (4/8/04 Hearing Transcript); see *Bedoya*, 91 F.3d at 352.  Although Plaintiff alleges

37

that the misbehavior report was "false,"[16] a review of the testimony at Plaintiff's hearing shows that Plaintiff claimed that "there's really no intent here to smuggle." 4/8/04 Hearing Transcript at 4.   Plaintiff does not claim that there was no letter or that the personal letter was not found in his legal envelope, but rather claims that he had a defense to the charge of smuggling because he did not mean to have the personal letter in the legal envelope.   Plaintiff also argues that he would have gotten as far as the visiting room with the letter if Defendant Stokes had done "his job," seen the letter sooner, and simply told Plaintiff that he could not take it to the visiting room. *Id.* Plaintiff also argues that there was nothing "bad" in the letter, and that there was nothing "threatening the facility in this letter." *Id.* at 9.   Plaintiff later explained to the hearing officer that it would not make sense for Plaintiff to try to smuggle a letter because he was well aware that his papers would be searched, and that it was just an honest mistake. *Id.* at 13-15. Thus, Plaintiff's claim appears not that the misbehavior report was "false," but rather merely that he had a justifiable defense to the allegation, namely, that he did not intend to smuggle the letter that was, in fact, in his legal envelope.

It is not for the court to re-weigh the evidence or the witnesses' credibility at prison disciplinary hearings. *Johnson v. Goord*, 2007 U.S. Dist. LEXIS 22992 at *21 (citing *Superintendent v. Hill*, 472 U.S. at 455.  Because the standard for sufficiency of evidence in a prison disciplinary hearing is "some" or "a modicum" of evidence,[17] it is clear that in this case, the evidence before the hearing officer, Defendant Gardner, met the constitutional standard.

---

[16] A false misbehavior report, in itself, does not rise to the level of a due process violation. *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988).

[17] *Superintendent v. Hill*, 472 U.S. at 455.

Thus, the due process claims against Defendants Stokes, Kimler, and Gardner relating to the April 8, 2004 disciplinary hearing and prior misbehavior report are dismissed.

### D.  Grievances

Plaintiff alleges that Defendant Eagen violated Plaintiff's due process rights when he upheld the Superintendent's decision "not to grant Plaintiff a legal call" and to deny Plaintiff's visitation without a hearing.

Prison grievance procedures do not confer any substantive rights that would require due process protection. *Torres v. Mazzuca*, 246 F. Supp.2d 334, 342 (S.D.N.Y. 2003)(citing *inter alia Mahotep v. Deluca*, 3 F. Supp.2d 385, 390 n.3 (W.D.N.Y. 1998)).  Thus, to the extent that Plaintiff alleges that his "due process" rights were violated because Defendant Eagen affirmed the denial of his grievances, the claim must be dismissed.

### E.  False Arrest

Finally, Plaintiff alleges that Defendant Daughtry violated Plaintiff's "due process rights" when he arrested Plaintiff without probable cause to believe that he was involved in an escape. AC ¶ 46B.  A claim of false arrest is not properly brought under the general due process protection, rather it is brought under the Fourth Amendment right to be free from unreasonable searches and seizures. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)(citing *inter alia Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995)).  A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Id.* (citing *inter alia Singer v. Fulton County Sheriff*, 63 F.3d 110. 118 (2d cir. 1995), *cert. denied*, 517 U.S. 1189 (1996)).

Under New York law, the action for false imprisonment was derived from the common-

law action of trespass and "protects the personal interest of freedom from restraint of movement." *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93 335 N.E.2d 310, 314 (1975), *cert. denied sub nom. Schenbarger v. Kellogg*, 423 U.S. 929 (1975).  A Plaintiff asserting a false arrest claim must show that the Defendant intended to confine Plaintiff; that Plaintiff was conscious of the confinement and did not consent; and finally, that the confinement was not otherwise privileged. *Martinez v. Schenectady*, 97 N.Y.2d 78, 85, 735 N.Y.S.2d 868, 872-73 761 N.E.2d 560, 564-65 (2001)(citing *Boughton*, 37 N.Y.2d at 458).

In this case, Plaintiff alleges that Defendant Daughtry "arrested" Plaintiff on February 10, 2004, without probable cause to believe that Plaintiff attempted to escape. AC ¶ 46B.  Since the concept of false arrest deals with "restraint" of movement, Plaintiff cannot under any circumstances present in this case, make a claim for false arrest.  Plaintiff was already in prison pursuant to a criminal conviction.  Regardless of his "arrest" on additional charges on February 10, 2004, Plaintiff would still have been incarcerated.  There was no additional restraint on his liberty, other than the administrative segregation that the court has determined was properly imposed.

Additionally, there is no indication that probable cause for Plaintiff's arrest on charges of attempted escape was lacking.  If an individual is convicted of the crime for which he was arrested, the conviction is a defense to an action asserting that the arrest was made without probable cause. *Cameron v. Fogarty*, 806 F.2d 380, 388-89 (2d Cir. 1986), *cert. denied*, 481 U.S. 1016 (1987).  Because Plaintiff was convicted of the charges, there can be no cause of action for false arrest against Defendant Daugherty.

**4.    Cruel and Unusual Punishment**

Plaintiff claims that conduct by various Defendants rose to the level of cruel and unusual punishment. The Eighth Amendment protects inmates against cruel and unusual punishment. U.S. CONST. amend. 8. Cruel and unusual punishment takes the form of "unnecessary and wanton infliction of pain" by prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmates health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Eighth Amendment places "restraints" on prison officials, including prohibiting the use of excessive force against inmates. *Id.* at 832. The Eighth Amendment also imposes affirmative duties on prison officials to provide humane conditions of confinement in terms of shelter, adequate food, clothing, and medical care, *id.,* and, in certain circumstances, protect inmates from violence by other inmates. *Id.* at 833.

There is an objective and a subjective prong to the Eighth Amendment analysis. *Wilson v. Seiter*, 501 U.S. at 297. Under the objective prong, the Plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* at 297. In order to be sufficiently serious, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer*, 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 828.

An inmate's claim that a defendant was deliberately indifferent in protecting him from the violence of other inmates states a claim under section 1983. *Hayes v. New York City Dep't of*

41

*Corrections*, 84 F.3d 614, 620 (2d Cir. 1996).  To state an Eighth Amendment claim for failure to

protect an inmate, the Plaintiff must show that he was incarcerated under conditions posing a

substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk

and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The Plaintiff must show

that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's

health and safety.  *Id.* at 837.  The Defendant must be aware of the facts from which the inference

can be drawn that a substantial risk of serious harm exists and the Defendant must also draw that

inference.  *Id.*

In this case, Plaintiff alleges Eighth Amendment violations against Defendants Smith,

Koemm, Karamanos, and Lutz.  The Court will consider each Defendant separately.

**A.  Smith**

Plaintiff alleges that Defendant Smith violated Plaintiff's Eighth Amendment rights when

he failed to protect Plaintiff from another inmate's attack; when he failed to protect Plaintiff

against Defendant Karamanos's harassment; when he created a "stressful situation" for Plaintiff;

when Smith refused to provide Plaintiff with an alternative to the facility laundry; when

Defendant Smith refused to return Plaintiff's typewriter after learning that Plaintiff had pain in

his hands from having to write a great deal; when he refused to return Plaintiff's reading lamp

after Smith learned that Plaintiff had eye pain, and when he "forced" Plaintiff to shave with a

regular razor rather than allowing him to use "electronic clippers."

With respect to the failure to protect, Plaintiff alleges that on August 25, 2003, another

inmate assaulted Plaintiff by throwing a cup of urine and feces on him. AC     ¶ 51.  Plaintiff

claims that Plaintiff asked Defendant Smith "several" times to be transferred "from the SHU

area" because of threats that Plaintiff had received from other inmates. *Id.* Plaintiff claims that he was assaulted due to Defendant Smith's failure to act on those requests. *Id.*

In Defendant's Smith's declaration, he states that he does not recall Plaintiff ever informing him of any threat by a specific inmate, however, Defendant Smith states that he does recall Plaintiff having an "altercation" with another inmate in the SHU recreation yard, at which time Plaintiff was moved to a separate SHU area. Smith Decl. ¶ 10. Plaintiff was deposed in this action on April 18, 2006. A transcript of the deposition has been included in Defendants' submissions in support of summary judgment. During the deposition, Plaintiff was asked what he told Defendant Smith about the threats, and Plaintiff stated that he specifically told Defendant Smith that the way that the visiting room was set up was dangerous. Deposition Transcript (DT) at 74. Plaintiff stated that although he told Defendant Smith that he was receiving threats, he did not tell Defendant Smith which inmates were threatening him or the nature of those threats. *Id.* at 74-75.

Plaintiff also claims that he told Defendant Smith that he would like to be moved to the hospital or moved to the "other side" of SHU because "certain inmates" were stating that if they "landed in the visiting room" with Plaintiff, they would "cut him" or beat him up. *Id.* at 76. Plaintiff then explained that the August 25, 2003 assault took place in the SHU recreation yard (not in the visiting room). *Id.* Plaintiff then states that an inmate began a conversation with Plaintiff, but Plaintiff did not respond. Plaintiff states that the inmate then kicked the gate that separated him from Plaintiff,[18] and when Plaintiff looked up, the inmate threw the cup of urine and feces through the gate at Plaintiff. *Id.* at 77.

---

[18] Plaintiff stated that the two inmates were separated by wire fencing. DT at 77.

When Plaintiff was asked who the inmate was that threw the urine and feces, Plaintiff stated that he had "[n]ever seen him before," and that he never saw him again because he was "moved to the other side after the incident." *Id.* (emphasis added). From Plaintiff's own description of the incident, it cannot reasonably be concluded that Defendant Smith was deliberately indifferent to a serious risk of harm to Plaintiff. Plaintiff states that he told Defendant Smith about a risk to him in the visiting room generally. Additionally, he never told Defendant Smith about any danger from specific inmates, and Plaintiff admitted at the deposition that he had never before seen the inmate who assaulted him. Finally, Plaintiff also admits that as soon as the assault occurred, he was "moved to the other side." This statement is consistent with Defendant Smith's declaration. Thus, this court finds that Plaintiff has not raised an issue of fact regarding Defendant Smith's alleged failure to protect Plaintiff from the assault.

Plaintiff also claims that Defendant Smith violated Plaintiff's Eighth Amendment rights by denying him a typewriter, a lamp, and his electric clippers. Defendant Smith states that these items were denied Plaintiff due to administrative segregation regulations and not due to any desire to deprive Plaintiff of any constitutional rights. Smith Decl. ¶¶ 19-21. Defendant Smith states that Plaintiff's typewriter, reading lamp, and electric clippers were not among the "standard issue" items or otherwise permissible property in SHU, and they were confiscated and stored upon Plaintiff's admission to SHU. *Id.* ¶ 20.

Defendant Smith does, however, state that Plaintiff was "provided with reasonable alternatives" to his requests. *Id.* ¶ 21. He was provided unlimited writing materials, his cell was adequately lighted to permit reading and writing, and he was issued a razor at each shower upon request. *Id.* ¶ 21. Finally, Defendant Smith states that no inmates are given the privilege of

laundering their clothing "in their own fashion." *Id.* ¶ 22.  Defendant Smith states that he told Plaintiff that any concerns regarding his laundry had to be addressed to the area supervisor and not to the Superintendent's office. *Id.*

None of the "deprivations" alleged by Plaintiff rise to the level of constitutional violations.  There is no constitutional right to a typewriter,[19] a particular lamp, to electric clippers, or to an "alternative" to the facility laundry.  Although Plaintiff makes conclusory allegations of "hand pain" from excessive writing and "eye pain" from the lack of his personal lamp, he does not allege deprivations of the "minimal necessities" of life or serious injury.  He does not indicate that he suffered any particular damage from these alleged denials.  He does not even explain why he needed an alternative to the facility laundry.  Although he complains about razor "bumps," there is no claim of a serious medical need relating to these bumps.

Plaintiff also alleges that Defendant Smith caused a "stressful situation," resulting in Plaintiff suffering a stroke.  Plaintiff claims that this "stressful" condition violated Plaintiff's Eighth Amendment rights.  Since this court has found that Plaintiff's placement and retention in administrative segregation comported with due process, and Plaintiff does not allege any other reason for his "stress," there is no merit to the claim that Defendant Smith "caused" Plaintiff's alleged stroke.  Moreover, there is no evidence of causation linking Plaintiff's Ad. Seg. placement with his stroke.  Plaintiff does not claim that he was denied proper medical care.

---

[19] *See Taylor v. Coughlin*, 29 F.3d 39 (2d Cir. 1994)(there is no constitutional right to a typewriter as incident to the right of access to courts).   A typewriter is not considered one of the minimal necessities of life and thus would not be related to the Eighth Amendment in any event.

During Plaintiff's deposition, he stated that the doctor[20] told Plaintiff that he was "faking" the stroke. DT at 87.  However, Plaintiff stated that the next morning, the nurse told the doctor that Plaintiff's blood pressure was "way over," and that the doctor "agreed with the nurse" and put Plaintiff on Procardia for "high blood pressure." DT at 87-89.  There is no indication that Defendant Smith caused Plaintiff's medical condition.

### B.  Koemm

In addition to other claims, Plaintiff alleges that Defendant Koemm violated Plaintiff's right to be free from cruel and unusual punishment on March 2, 2004 when Plaintiff was transported to court.  Plaintiff alleges that Defendant Koemm forced Plaintiff out of his cell at 7:00 a.m., demanded that he only wear his underwear, and forced him to walk more than 100 feet in the cold in front of other inmates and female officers.  Plaintiff also claims that on July 27, 2004, during another trip to court, Defendant Koemm refused to feed Plaintiff and kept him in shackles for more than eleven hours.

Defendant Koemm states in his declaration that he did arrive at Plaintiff's cell early in the morning without advance notice that Plaintiff was being transported to court. Koemm Decl. ¶ 13. The purpose of this procedure is so that the inmate would not be able to smuggle items out of his cell and would not have the opportunity to contact other inmates, friends, or family regarding the logistics of his transportation.  Due to the fact that Plaintiff was under investigation for attempted escape, he was considered a "high risk" inmate. *Id.* ¶ 11.

Defendant Koemm further states that Plaintiff was wearing boxer shorts and a t-shirt and

---

[20] Dr. Forte was initially named as a Defendant, but is now deceased and there has been no substitution. (DT at 87).

was given shower shoes to walk to the frisk area. *Id.* ¶ 13.  Plaintiff was escorted by Defendant

Koemm and other officers to a separate part of the facility where Plaintiff was strip frisked and

issued clothing to wear to court. *Id.*  Again, the purpose of this procedure was to prevent the

inmate from concealing items in clothing that was kept in his cell. *Id.*  Finally, Defendant

Koemm states that the area from Plaintiff's cell to the frisk area is completely enclosed, and

Plaintiff did not have to leave the building to enter the transportation van until he was fully

clothed. *Id.* ¶ 14.

Plaintiff's claim that he was not given notice of his transportation to court or that he had

to walk 100 feet in the cold does not rise to the level of cruel and unusual punishment.  Plaintiff

was given shower shoes, and he was wearing boxer shorts and a t-shirt.  There is no indication

that Plaintiff suffered any "unnecessary or wanton infliction of pain" in violation of the Eighth

Amendment.  It has been held that using restraints during transportation of an inmate is necessary

to protect staff, other inmates, and the public. *See Richardson v. Castro*, 97-CV-3772, 1998 U.S.

Dist. LEXIS 7457, *16-17 (E.D.N.Y. April 24, 1998).  In *Richardson*, the court held that there

was no due process violation as a result of the use of shackles, and that there was no evidence

that the prison officials caused the "unnecessary or wanton infliction of pain" in violation of the

Eighth Amendment in using the shackles. *Id.* at *17.

Defendant Koemm also states that all high risk inmates are shackled during

transportation, and upon arrival at the courthouse, the presiding judge makes the determination of

whether the shackles should be removed, and in this case, the judge did not order that Plaintiff's

shackles be removed.[21] Koemm Decl. ¶ 16.  The Court will assume that Plaintiff was shackled for the eleven hours that he claims, but Plaintiff does not allege that he suffered "unnecessary or wanton infliction of pain" or any damage whatsoever from the extended restraint.

Finally, it is true that the Eighth Amendment prevents prison officials from depriving inmates of their "basic human needs" such as food, clothing, shelter, medical care, and reasonable safety. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)(quotation omitted). With respect to nutrition, the Eighth Amendment requires that inmates be served nutritionally adequate food that is prepared under conditions that do not present an "immediate danger to the health and well being of the inmates who consume it." *Id.* (citing *Robles v. Coughlin*, 725 F.2d 12, 14 (2d Cir. 1983)(per curiam)(internal quotation marks omitted)).  The court in *Robles* stated that under certain circumstances, a substantial deprivation of food may rise to the level of a constitutional violation. 725 F.2d at 15 (citation omitted).

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis.  In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious and the Defendant must have been deliberately indifferent to the inmate's health or safety. *Farmer v. Brennen*, 511 U.S. at 834.  In this case, even assuming that Plaintiff was delayed in appearing before the Grand Jury, and that as Defendant Koemm states,

_____

[21] The court also notes that in Plaintiff's response to the cross-motion for summary judgment he has included portions of the memorandum in his state court motion to set aside the verdict. (Dkt. No. 128, Exhibits Pt. 2).  In this memorandum, Plaintiff argues that DOCS had nothing to do with Plaintiff remaining in shackles during his Grand Jury testimony, that it was the prosecutor's decision, and that the prosecutor "managed to manipulate Judge Walker in an exparte [sic] hearing. . . ." Exhibits, Pt. 2 at p.1.  This is completely consistent with Defendant Koemm's statement that it was the presiding judge's decision to maintain the restraints on Plaintiff.  Plaintiff cannot make one argument in his state court papers and make the opposite argument in this case.

Plaintiff was not given an evening meal, the fact that Plaintiff did not eat until he returned to the facility and may have gone eleven hours without eating does not rise to the level of a constitutional claim against Defendant Koemm.  Thus, the Eighth Amendment claim of denial of food is dismissed.

### C. Karamonos

Plaintiff alleges that between September 26, 2003 through October 10, 2003, Defendant Karamonos violated Plaintiff's right to be free from cruel and unusual punishment by kicking Plaintiff's cell door every half hour while Plaintiff slept, by refusing to give Plaintiff toilet tissue, writing paper, soap, and toothpaste, by spitting in Plaintiff's food, and by threatening Plaintiff. AC ¶¶ 55, 79.

Inmates have no constitutional right to be free from harassment. *Greene v. Mazzuca*, 2007 U.S. Dist. LEXIS 30923, *5-6 (S.D.N.Y. April 26, 2007(citing *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998)).[22]  It is well settled that verbal harassment, inexcusable as it may be, does not rise to the level of a constitutional violation. *Purcell v.  Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996).

As in other Eighth Amendment claims, in order for harassment to rise to the level of a constitutional violation, the alleged harassment must be "objectively and sufficiently serious," denying the Plaintiff the "minimal civilized measure of life's necessities."  *Greene v. Mazzuca*, 2007 U.S. Dist. LEXIS 30923 at *6.  Additionally, the Defendant must have exhibited deliberate indifference to the inmate's health or safety. *Id.*  Finally, the Plaintiff must show that the alleged

---

[22] *Shabazz v. Pico* was vacated in part on other grounds unrelated to the harassment issue. *See Shabazz v. Pico*, 205 F.3d 1324 (2d Cir. 2000), *reported in full*, 2000 U.S. App. LEXIS 3404 (2d Cir. Feb. 24, 2000).

harassment resulted in some injury or damage. *Id.* (citations omitted).

In this case, Plaintiff filed grievances regarding Defendant Karamonos's alleged behavior. The grievance documents have been submitted as Exhibits B and C to Defendant Smith's declaration.  Plaintiff's main complaint appeared to be the denial of his magazines.  Although the federal complaint alleges that Defendant Karamonos kicked Plaintiff's cell door "every half an hour while he slept," the grievances state that most of Defendant Karamonos's alleged kicking occurred at 3:00 p.m. in the afternoon, and at the latest by 11:00 p.m.[23]  At his deposition, Plaintiff stated that if Plaintiff wanted to sleep during Defendant Karamonos's shift, this Defendant would kick the bottom of the gate and wake Plaintiff up. DT at 96-97.

While it is true that Plaintiff alleged in his grievances that Defendant Karamonos denied Plaintiff tissue, pens, and other items in order to harass Plaintiff, Plaintiff does not allege that he did not receive these necessities from other officers at other times or that he was unable to maintain his hygiene for any length of time.  In fact, at his deposition, he stated that Defendant Karamonos worked only the 3-11 shift on Monday through Friday, and Plaintiff was able to get "tissue" and he was able to get writing paper on the weekends. DT at 99-100.  It has been held that a temporary denial of toiletries, while perhaps uncomfortable, does not create such an "obvious risk to an inmate's health and safety" to show deliberate indifference by Defendant. *Chavis v. Kienert*, 2005 U.S. Dist. LEXIS 41920, 66-67 (N.D.N.Y. Sept. 30, 2005).

With regard to Plaintiff's claim that Defendant Karamonos tampered with or "spit" in his food, there is insufficient evidence of such before to the Court to sustain the claim. *Chavis*, 2005

---

[23] Plaintiff states in his grievance that Defendant Karamonos worked the 3:00-11:00 p.m. shift.

U.S. Dist. LEXIS 41920, *65-66.  While claims of unsanitary, spoiled or contaminated food may be sufficient to raise an Eighth Amendment claim, the allegations in the Amended Complaint that Defendant Karamonos "spit" in Plaintiff's food and poked his finger in Plaintiff's food are conclusory and unsubstantiated. See AC ¶ 55. [24]  Plaintiff provides no factual support for the contention and, therefore, the claim in subject to dismissal. See *Chavis*, 2005 U.S. Dist. LEXIS 41920, *65-66.  Plaintiff's Eighth Amendment claims against Defendant Karamonos are dismissed.

### D.  Lutz

Plaintiff's last Eighth Amendment claim states that Defendant Lutz would not allow Plaintiff to shower for forty five minutes after another inmate attacked Plaintiff with feces and urine. AC ¶ 52.  In his declaration, Defendant Lutz states that on August 25, 2003, he was a Sergeant, and the SHU Supervisor at Shawangunk. Lutz Decl. ¶ 4.  Defendant Lutz was apparently not present in the SHU at the specific time that this incident occurred.  Defendant Lutz states that he was told that Plaintiff had been involved in a disturbance in the yard, and on the way to the yard, Defendant Lutz stopped at Plaintiff's cell "for about a minute" to inquire what had happened, but that Plaintiff would not tell him. *Id.* ¶ 5.

Defendant Lutz then went to the yard. *Id.*  Defendant Lutz arrived at the yard thirty minutes after the incident. *Id.* ¶ 6.  When Defendant Lutz arrived at the yard, he was told that the incident involved another inmate throwing feces and urine on Plaintiff. *Id.* ¶ 7.  Defendant Lutz states that he requested that an officer photograph the area where the incident took place. *Id.*

---

[24] Plaintiff's claim does not appear to be based upon an allegation of daily food tampering, but rather upon isolated incidents during the 2 week period. See  Smith Decl. Ex. B & C.

Defendant Lutz also stated that following the incident, there was considerable commotion in the SHU unit, which could have caused a threat to security, and that after remaining in the yard for a few minutes, Defendant Lutz returned to Plaintiff's cell to again ask what had occurred. *Id.* ¶¶ 9-10.  However, Plaintiff declined to respond and refused any medical treatment. *Id.* ¶ 10. Plaintiff was then moved to the protective custody side of SHU for his own safety. *Id.* ¶ 11. Defendant Lutz states that he brought Plaintiff to the shower "within approximately 10 minutes of arriving at his cell for the second time." *Id.* ¶ 13.  Although Plaintiff alleges that Defendant Lutz threatened that he would not take Plaintiff to shower until Plaintiff told Defendant Lutz what happened, Defendant Lutz states that any delay in bringing Plaintiff to the shower was to ascertain what had happened, assess the situation and the resulting commotion in SHU, and move Plaintiff for his own protection. *Id.* ¶ 14.

Plaintiff alleges that he was not allowed to shower "until forty-five minutes after the assault in the SHU recreation yard." AC ¶ 52 (emphasis added).  While this fact may be accurate, there is no dispute that Defendant Lutz did not arrive at the SHU yard until thirty minutes after the incident, so any delay caused by Defendant Lutz could only have been approximately fifteen minutes, which is completely consistent with Defendant Lutz's statement.   Based on the undisputed facts, no reasonbale fact finder could conclude that the deprivation imposed on Plaintiff by this Defendant[25] was "sufficiently serious," or that Defendant Lutz was deliberately indifferent to a serious risk of harm to Plaintiff.  Thus, all of Plaintiff's Eighth Amendment claims are dismissed.

---

[25] This Defendant cannot be responsible for a delay prior to the time that he arrived and was in a position to remedy the situation.

5.   __First Amendment__

Plaintiff alleges various other claims.  These claims relate to his ability to receive mail, his visitation, and his right to confer privately with counsel.  Interference with mail, in general, implicates an inmate's First Amendment right to free speech, and interference with an inmate's legal mail also implicates the Plaintiff's First Amendment right to access to courts.

An inmate has the First Amendment right to the free flow of incoming and outgoing mail. *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006).  Regulations limiting the right to send and receive mail are valid if "reasonably related to legitimate penological interests." *Id.* (citing *Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir. 1987) (quoting *Turner v. Safely*, 482 U.S. 78, 89 (1987)).  When courts consider competing interests, they have consistently afforded greater protection to an inmate's legal mail in comparison to an inmate's personal mail. *Id.* (citation omitted).  Claims regarding legal mail are often tied to claims of the denial of access to courts. *Moore v. Gardner*, 199 F. Supp. 2d 17, 33 (W.D.N.Y. 2002).

In *Turner*, the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Turner v. Safely*, 482 U.S. at 89.  Finally, the court must determine whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

With respect to visitation, it has been generally held that there is no First Amendment right to visitation in prison,[26] however, the Supreme Court has analyzed restrictions on visitation

---

[26] *See Calderon v. Dzurenda*, 2006 U.S. Dist. LEXIS 55831, *8-10 (D. Conn. July 24, 2006).

under the *Turner* standard. *See Overton v. Bazzetta*, 539 U.S. 126, 137 (2003).  Finally, inmates

have no "per se" constitutional right to use a telephone. *Charles v. Maleh*, 02-CV-1341, 2006

U.S. Dist. LEXIS 9878, *26-27 (D. Conn. Mar. 8, 2006)(citing *inter alia Bellamy v. McMickens*,

692 F. Supp. 205, 214 (S.D.N.Y. 1988)(holding that inmates have no right to unrestricted

telephone use)).

### A.  Smith

Plaintiff alleges that Defendant Smith improperly instituted a mail watch in violation of

Plaintiff's First Amendment rights.  Plaintiff also claims that Defendant Smith denied Plaintiff

telephone calls to his attorney and a visit with his attorney, as well as a visit with his clergyman.

Defendant Smith concedes that he placed a mail watch on Plaintiff's mail. Smith Decl. ¶

16.  Defendant states that the order was based upon DOCS Directive No. 4421, § 721.3(c)(1)-

(4)[27] and a request from the Inspector General's Office.  The mail watch order, the reasoning for

that order, and the extensions of that order have been submitted as an exhibit to Defendant

Smith's declaration.[28] Smith Decl. Ex. F.  Defendant Smith states in his declaration that the basis

for the order was the determination that because of the ongoing criminal investigation of Plaintiff

for the attempted escape, his mail, including his legal mail, posed a threat to facility security.

Smith Decl. ¶ 16.

Directive No. 4421 which governs privileged correspondence provides that even

---

[27] Although Defendant Smith refers to this provision as a section of the DOCS Directive, the
regulation is also contained in Title 7 of the New York Code of Rules and Regulations. N.Y. COMP.
CODES R. & REGS., tit. 7, § 721.3. (7 NYCRR).

[28] The court does note that the mail watch orders themselves reference DOCS Directive 4422
which governs general, rather than privileged correspondence.  The Superintendent's handwritten
order, however, states that the order includes legal mail. Smith Decl. Ex. F at p.3.

privileged or legal mail may be opened outside the presence of the inmate if the Superintendent makes a written determination that the mail poses a threat to the security or order of the facility. Smith Decl. Ex. E, DOCS Directive 4421, § 721.3(c) (1)-(4).  The directive does provide that if the Superintendent authorizes an inmate's privileged mail to be read, it may only be read by the Superintendent, a deputy Superintendent (DSS), or Central Office Staff. *Id.* § 721.3(c)(2).  The orders in this case properly provided that the mail was to be "detained" (not opened) and sent to the DSS Office. *See* Smith Decl. Ex. F at p.2.  The mail would only be read by the DSS or the Superintendent.  The mail watch was initiated on May 16, 2003 and was extended every 60 days until June 22, 2005. *Id.* at p.1.

Although Plaintiff complains about the procedures that were used when he was in administrative segregation, he must remember that he was being investigated for his involvement in an attempted escape, and this involvement included communications with individuals both inside and outside of the prison.  The reasonableness of the mail watch is clear.  Although Plaintiff attempts to justify his arguments by bitterly maintaining that he never did anything and did not attempt to escape, this is true only because the attempt was thwarted before Plaintiff had the opportunity to participate.  The fact that he did not actually do anything does not mean that he was not involved in planning the escape that never occurred.  Thus, Plaintiff's First Amendment claim regarding his mail watch are dismissed.

To the extent that Plaintiff is attempting to raise a First Amendment denial of access to courts claim based upon the interference with his legal mail, he must show actual injury as a result of the deficient access to courts. *Lewis v. Casey*, 518 U.S. 343 (1996).  The cause of the injury must be inadequacy of the access.  *Id.* at 351.  Plaintiff must show that a non-frivolous

legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood*, 2 F. Supp.2d 306, 312 (W.D.N.Y. 1998)(quoting *Lewis v. Casey*, 518 U.S. at 353).

In this case, Plaintiff has not made the requisite showing. The fact that he was convicted of the criminal charges does not indicate that the "cause" of the injury was Plaintiff's mail watch. Plaintiff has made an inadequate showing that the mail watch somehow caused or contributed to his conviction. Plaintiff cites no other case that was hindered or lost because of the mail watch. Thus, any First Amendment claim of denial of access to courts based upon the mail watch must be dismissed.

Plaintiff alleges that Defendant Smith denied Plaintiff a visit from Minister James Willis on May 25, 2003 and a visit from Plaintiff's attorney on June 18, 2003. Defendant Smith states in his declaration that he did not personally deny Plaintiff a visit from Minister Willis,[29] but rather handled the grievance that Plaintiff filed as a result of that denial.[30] Smith Decl. ¶ 14. Plaintiff filed a grievance regarding the denial of the Minister's visit. (Dkt. No. 105, Plaintiff's Ex. J). In the grievance, Plaintiff alleged that the Minister Willis was not allowed to visit Plaintiff because he did not have "official I.D.," and that his identification was confiscated so that the facility could verify that he was a "real chaplain."

Again, there is no question that Minister Willis was not initially allowed to visit Plaintiff. However, during Plaintiff's deposition, he admitted that Minister Willis was allowed to visit

---

[29] Plaintiff claims that the "John Doe" Defendants harassed Minister Willis when he attempted to visit Plaintiff. These John Doe Defendants were never identified or served. Because the court is finding that there was no First Amendment violation in the initial denial of visitation, this court would have dismissed the action as against these John Doe Defendants in any event.

[30] There is no question that Plaintiff was initially denied the opportunity to visit with Minister Willis.

Plaintiff a few weeks later, and was allowed to visit Plaintiff various times after the only time

that he was questioned about his identity.[31] DT at 49-51.  Given the facts surrounding the

investigation of Plaintiff, and the fact that the individual who entered the facility to assist

Plaintiff in escaping was impersonating a corrections officer and had false identification, it is

quite reasonably related to the safety and the security of the facility that anyone visiting Plaintiff

thereafter would be subject to a verification procedure.

 The same is true for the one denial of Plaintiff's visit with Attorney Robert Horne.

Defendant Smith states that Plaintiff was denied a visit with Attorney Horne on June 3, 2003.[32]

Smith Decl. ¶ 15.  Defendant Smith states that the reason for this denial was that Attorney Horne

was not properly listed for visiting purposes, but that upon further review, a visit with Attorney

Horne was authorized. *Id.*  During his deposition, Plaintiff testified that Attorney Horne was

coming to visit Plaintiff to discuss representing him on the potential criminal case against him

relating to the escape attempt. (DT at 52).

 When he first attempted to visit Plaintiff, Attorney Horne was not actually representing

Plaintiff. *Id.*  However, Plaintiff conceded during his deposition that Attorney Horne was allowed

to visit Plaintiff a month later. (DT at 52-53).  Plaintiff stated at his deposition that the attorney

told Plaintiff that he was not allowed to visit Plaintiff the first time because "they" did not want

Plaintiff to know what was "going on." (DT at 53).  However, apparently this was not a problem

the following month when Attorney Horne was allowed his visit.  Plaintiff stated that Attorney

---

[31] It was during that later visit that Minister Willis told Plaintiff that the minister had been "harassed" at the front gate and had his identification confiscated. (DT at 50).

[32] Defendant Smith states that although Plaintiff alleges that the denial took place on June 18, 2003, the facility records indicate that the denial occurred on June 3, 2003.

Horne did not ultimately represent Plaintiff at the criminal trial, thus, no harm to Plaintiff's criminal case could have been caused by the denial of one visit. (DT at 53). The failure to allow Attorney Horne to visit Plaintiff on one occasion did not violate any of Plaintiff's First Amendment rights.

Plaintiff claims that Defendant Smith denied Plaintiff the opportunity to call another attorney on the telephone. On June 1, 2003, Plaintiff filed a grievance regarding this denial. (Dkt. No. 105, Plaintiff's Ex. L). Plaintiff's rationale for requesting the telephone call was that he was under investigation, and could have "future" charges brought against him. *Id.* Plaintiff also stated that he could not write to his attorney because "all of [his] legal and personal mail [was] being held by the Inspector General and DSS Maly, so there is no other way for me to contact my lawyer." *Id.*

Contrary to Plaintiff's claims, he was under a "mail watch." His mail was not being "held." The grievance was denied because telephone calls in administrative segregation were prohibited, "except for emergency calls and legal telephone calls as approved by the superintendent." (Dkt. No. 105, Plaintiff's Ex. N). The Central Office Review Committee upheld Defendant Smith's determination that allowing Plaintiff to make telephone calls would compromise security, and advised Plaintiff that he could write to his attorney. *Id.*

Notwithstanding this denial, Plaintiff was later allowed to make the emergency telephone call at the request of his attorney. Defendants have submitted a letter from Plaintiff's attorney dated September 2, 2003 thanking the facility for arranging an emergency telephone conference regarding Plaintiff's appeal. Smith Decl. ¶ 18 & Defendants' Ex. G (letter from Ronald L. Kuby). Attorney Kuby's letter requested that another telephone call be scheduled for the following week,

prior to oral argument on Plaintiff's appeal. *Id.* Plaintiff does not indicate that he suffered any injury as the result of the inability to telephone his attorney from the facility.

### B. Eagen

Plaintiff also names Defendant Eagen as being responsible for the First Amendment violations because Defendant Eagen affirmed the denial of Plaintiff's grievances. As stated above, Defendant Eagen states in his declaration that he actually has no vote in the resolution of the grievance appeals, and in any event, this court has found that there were no First Amendment violations in the first instance. Thus, Plaintiff's First Amendment claims regarding visitation and legal mail may be dismissed as to Defendant Eagen.

### C. Koemm

Plaintiff alleges that he was denied the right to confer in private with his attorney on February 10, 2004 and on March 2, 2004. AC ¶ 56. Plaintiff alleges that he was effectively prevented from speaking with his attorney prior to his appearance in court. *Id.* During Plaintiff's deposition, he stated that he was not prevented from conferring with counsel, but that there was a corrections officer present during the conversations. (DT at 105-107). Plaintiff also conceded at the deposition that he was able to speak with his attorney in court at counsel table, and that his attorney visited him at Shawangunk. (DT at 105-106).

In his declaration, Defendant Koemm states that because Plaintiff was "high risk" status, the security threat required that there be at least one officer standing "at a reasonably close distance" to Plaintiff while he conferred with counsel. Koemm Decl. ¶¶ 6-7. Defendant Koemm states, however, that the officer remained at an "optimal distance" in order to "balance the competing interests of security and privacy." *Id.* ¶ 7.

Plaintiff only alleges these two instances in which he was allegedly prevented from conferring "privately" with counsel.  Clearly, because Plaintiff was being charged with escape, it was reasonable to consider him a "high risk" inmate.  The restriction on Plaintiff's privacy on these two occasions, particularly since Plaintiff was able to confer with his attorney at counsel table, was rationally related to legitimate security interests.  Thus, even assuming that Defendant Koemm or one of his officers needed to stand in close proximity to Plaintiff, doing so did not violate any of his constitutional rights.  Plaintiff does not claim that he was harmed in any way by this alleged invasion of his privacy on these two isolated occasions.  Thus, Plaintiff's constitutional claims against Defendant Koemm may be dismissed.

**6.**   **Retaliation**

In order to establish a claim of retaliation for the exercise of a constitutional right, Plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by Defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, Plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).[33]

---

[33] The court would note that *Dawes* did not create a "heightened pleading standard", and to the extent that it did create such a standard, the Second Circuit held that *Dawes* was inconsistent with *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002). *See Phelps v. Capnolas*, 308 F.3d 180, 187 (2d Cir. 2002).  The decision in *Phelps* resulted from a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and the court was considering only the face of the complaint.  This case comes before the court upon a motion for summary judgment, thus, this case is distinguishable from a situation in which only the complaint is being examined.

The court in *Dawes* stated that in order to survive summary dismissal, the Plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the Defendant took adverse action against the Plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

239 F.3d at 492 (citations omitted).  Although it is sometimes argued that in order to establish that an act was sufficiently "adverse," a Plaintiff must allege an actual chill of his or her First Amendment rights, the Second Circuit has held that in a prison context, all that is required is that the adverse conduct by Defendant would have deterred a similarly situated individual of ordinary firmness from exercising his First Amendment rights. *See Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).  In *Gill*, the court held that this objective test applied, even where a particular Plaintiff was not subjectively deterred and continued to file grievances and lawsuits. *Id.*

In this case, Plaintiff's final argument is that Defendant Kimler retaliated against Plaintiff for filing a lawsuit against "her peers." AC ¶ 67.  Plaintiff claims that Defendant Kimler took Plaintiff's legal books and refused to return them. *Id.*  Defendant Kimler states in her declaration that on August 3, 2004, Corrections Officer Cusack performed a routine cell search of Plaintiff's SHU cell and confiscated "among other things, books and magazines that were in excess of the number of items allotted SHU inmates." Kimler Decl. ¶ 5.  Defendant Kimler states that the excess books and magazines were simply placed in Plaintiff's personal property box according to DOCS Directive 4933. *Id.*  Defendant Kimler states that one book, entitled "Prisoner Self-Help Litigation Manual" was returned to the Law Library, and a bible was returned to Plaintiff. *Id.*  Defendant Kimler also states that Officer Cusack did not issue a misbehavior report, but that

Plaintiff complained so much that Defendant Kimler investigated the situation further. *Id.*

Defendant Kimler contacted the law library staff and determined that although two books had been signed out by Plaintiff, they were both Federal Reporters, and not the Prisoner Self-Help Litigation Manual. *Id.*  Defendant Kimler states that although Plaintiff may argue that his mother sent him the manual in question, Defendant Kimler noted that the book was "clearly stamped 'SHU' in large letters on the front and on the binding of the book." *Id.* ¶ 6.  Defendant Kimler concedes that the books were not taken because they were a "threat" to facility security, rather they were simply confiscated because Plaintiff had too many books in his SHU cell. *Id.*

In the amended complaint, Plaintiff's claim against Defendant Kimler is mentioned in two paragraphs, both stating in a conclusory fashion that Defendant Kimler took Plaintiff's legal books in retaliation for his filing "a" lawsuit. AC ¶¶ 67, 84.  There is absolutely no explanation of why Plaintiff believes this to be true, and this is the type of conclusory allegation that cannot withstand a motion for summary judgment.

It is unclear to which lawsuit Plaintiff is referring.  The original complaint in this case was filed on November 17, 2003.  The original complaint did not name Defendant Kimler as a Defendant. (Dkt. No.1).  The amended complaint was filed on October 15, 2004. (Dkt. No. 36).  The books mentioned in Defendant Kimler's declaration were confiscated on August 3, 2004, and they were not confiscated by Defendant Kimler.  The search was conducted by Officer Cusak, and he decided not to issue a misbehavior report for the unauthorized number of books.  Kimler Decl. ¶ 5.  Plaintiff does not respond to Defendant Kimler's assertions of fact.

Without more, Plaintiff's conclusory allegations of retaliation cannot survive.  There is no relationship between the confiscation of books in 2004 by Officer Cusak and Defendant Kimler's

62

refusal to return a book that did not belong to Plaintiff and Plaintiff's lawsuit.  Defendant Kimler

has asserted a valid reason for the confiscation of the books, and Plaintiff does not challenge this

assertion of fact.  Thus, Plaintiff's final claim is dismissed.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that Plaintiff's motion for partial summary judgment (Dkt. No. 105) is

**DENIED**, and it is

**ORDERED**, that Defendants' cross-motion for summary judgment (Dkt. No. 121) is

**GRANTED** and the amended complaint is **DISMISSED IN ITS ENTIRETY**.

**IT IS SO ORDERED**.

DATED:July 19, 2007

Thomas J. McAvoy
Senior, U.S. District Judge